UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | CRIMINAL NO. 5:13-52-KKC |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **OPINION AND ORDER** |
| BRUCE A HARRISON, | ) | |
| | ) | |
| Defendant. | ) | |

\*\* \*\* \*\* \*\* \*\*

This matter is before the Court on the motion to suppress (DE 192) filed by Bruce A. Harrison. The Court has conducted a hearing on the motion and the parties have submitted briefs. For the following reasons, the motion will be DENIED.

**I.     Introduction**

Harrison is charged with various crimes regarding the distribution of oxycodone, growing marijuana, and being a felon in possession of a firearm. He moves to suppress certain evidence seized by FBI agents from a portion of his residence located at 1501 Ford Road, Winchester, KY. Harrison argues that the portion of the residence from which the items were seized was a separate apartment with the address of 1501A Ford Road which he leased to an individual named Michael West.

The search warrant authorized officers to search "1501 Ford Road, Winchester, KY" which was described in the warrant as "a single family residence . . . owned by Bruce Allen Harrison." (DE 192-1, Warrant.) Harrison argues that the officers acted unreasonably when they also searched the alleged apartment.

The FBI seized various items from the alleged apartment area including prescription pill bottles bearing Bruce Harrison's name for several kinds of medication including oxycodone. Some of the bottles were empty and others contained pills. (DE 218, Hr'g Tr. at 22; Hr'g, Def. Ex. 22.) The FBI also seized various firearms from the alleged apartment area.

II.    Analysis

A.    **Validity of the Warrant**

A challenge such as this generally presents two separate constitutional issues: 1) the validity of the warrant; and 2) the reasonableness of the manner in which it was executed. *Maryland v. Garrison*, 480 U.S. 79, 84 (1997).

In *Garrison*, the police obtained a warrant to search "2036 Park Avenue third floor apartment." *Id*. At the time the police obtained the warrant and at the time they conducted the search, the officers "reasonably believed there was only one apartment on the premises" but, in fact, the third floor was divided into two apartments, one of which was occupied by the target of the search, the other of which was occupied by Garrison. *Id*.

Before the officers knew they were in Garrison's apartment, they discovered the contraband that formed the basis for Garrison's state drug charges. It was only some time after they entered Garrison's apartment and discovered drugs and cash that any of the officers realized that the third floor contained two apartments. At that point, they ceased the search.

As to the first issue – the validity of the warrant – the Court noted that the Fourth Amendment prohibits courts from issuing a warrant unless it "particularly describ[es] the

place to be searched and the persons or things to be seized." *Id*. This was intended "to prevent general searches" and "the wide-ranging exploratory searches the Framers intended to prohibit." *Id*.

The Court determined that the validity of the warrant had to be determined based on the information available to the officers at the time they obtained it. Information that emerges "after the warrant is issued ha[s] no bearing on whether or not a warrant was validly issued." *Id*. at 85. "[T]he discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." *Id*. The Court concluded that the officers reasonably believed that the target was the only tenant on the third floor and, thus, the warrant was valid when issued. *Id*. at 85-86 & n. 10.

Harrison explicitly states in both his response and his reply that he does not challenge the validity of the warrant. (DE 192, Mot. at 2-3; DE 249, Reply at 3.) Furthermore, the evidence demonstrates that the agents conducted a reasonable investigation of the premises prior to applying for the search warrant and that, at the time they applied for the warrant, they reasonably believed that the premises consisted of a single-family residence.

FBI Special Agent Christopher Hubbuch testified that he was a primary case agent for the investigation of Harrison. (DE 218, Hr'g Tr. at 60.) He testified that, prior to the execution of the search warrant, he supervised the activities of a cooperating witness who had permission to enter Harrison's residence. (DE 218, Hr'g Tr. at 60.) Hubbuch testified that, prior to the execution of the search warrant, he engaged in certain activities to verify the information regarding the residence provided to him by the cooperating witness. (DE 218, Hr'g Tr. at 60.) Hubbuch testified that he viewed

3

photographs of the residence that were available on the internet (DE 218, Hr'g Tr. at 61) and that the FBI conducted "drive-by surveillance" of the residence. (DE 218, Hr'g Tr. at 77.)

Hubbuch testified that, five days prior to the search, the cooperating witness entered the residence with a concealed video camera and purchased 50 oxycodone pills. (DE 218, Hr'g Tr. at 61-62, 82.) At the hearing, the government submitted portions of the video containing footage of the residence. Hubbuch explained that the cooperating witness moved with the camera down the hall to the right side of the residence and that, at the end of the hall, there was a doorframe with no door on it. (DE 218, Hr'g Tr. at 62-63.) Hubbuch testified that, on the other side of the doorframe, there was a kitchen, bedroom, living room, and bathroom which made up the area that Harrison identifies as the apartment. (DE 218, Hr'g Tr. at 64; Hr'g Gov. Ex. 2.)

Monica Goodwin, Harrison's fiancée, also lived at the residence. She agreed that, on the day of the search, there was no door in that doorframe and that there had been no door there for about three weeks. (DE 218, Hr'g Tr. at 14.) Hubbuch testified that he was informed that the area beyond the doorframe was Harrison's "man cave." (DE 218, Hr'g Tr. at 82.)

The Court has viewed the DVD and the pictures of the residence as it appeared on the day of the search. No door or any other physical barrier separates the alleged apartment area from the residence. Nor is there any other indication in the video that the area beyond the doorframe is a separate residence inhabited by anyone other than Harrison.

Harrison has submitted a copy of a one-year lease agreement between him and Michael West signed November 3, 2012. (DE 192-4.)[1] Pursuant to the agreement, West agreed to pay Harrison $400 for the premises identified as "1501 Ford Rd. Apt. A." West testified that he leased an apartment from Harrison for one year beginning November 3, 2012. (DE 218, Hr'g Tr. at 42.) He testified that he paid Harrison $400 a month in rent or that he did odd jobs to pay for the apartment when he did not have the cash. (DE 218, Hr'g Tr. at 42.) West testified that he received mail at the premises. (DE 218, Hr'g Tr. at 44.) The Defendant submitted two pieces of mail addressed to Michael West at 1501 Ford Road #A, one of which contains a date prior to the search. (Hr'g Def. Ex. 20, 23; DE 218, Hr'g Tr. at 44.)

Nevertheless, there is no evidence that any of the agents who obtained the warrant ever saw the lease or were aware of any mail addressed to West at the premises. Hubbuch testified that neither the cooperating witness nor any of the surveillance officers ever saw Michael West on the premises. (DE 218, Hr'g Tr. at 74, 77.)

Hubbuch testified that, to the left of the house, there is a short driveway that leads up to the garage. (DE 218, Hr'g Tr. at 85.) To the right of the house, there is a driveway that goes behind the house and to the basement. (DE 218, Hr'g Tr. at 85.) Goodwin, who has lived at the residence since 2010, testified that Harrison built the apartment onto the house in 2011. (DE 218, Hr'g Tr. at 10-11.) She testified that there is an outside entrance into the apartment and that the apartment has a separate driveway. (DE 218, Hr'g Tr. at

---

[1] For reasons that were unexplained, the lease agreement provides that Harrison's address is "Bangkok," requires the tenant to "pay the telephone bill which is the actual rate billed by the Thai Government," and requires the tenant to pay rent in "Baht," which is the currency of Thailand. The Court assumes that these are errors in the lease that simply went unnoticed by the parties.

5

11-12.) She testified that a fence runs along the driveway with the address "1501A" on it and that the address is clearly readable from the street. (DE 218, Hr'g Tr. at 12.)

Harrison has submitted a photograph of the fence showing the address "1501A" on it. (Hr'g. Def. Ex. 9.) Goodwin testified that she took the photographs several months after the search but that the address was on the fence on the day of the search. (DE 218, Hr'g Tr. at 12.) Hubbuch testified that no agent ever reported to him that the fence contained the address "1501A" and that he did not recall seeing that address on the fence on the day of the search. (DE 218, Hr'g Tr. at 83.) It is entirely understandable that the agents may never have seen the letter "A" on the fence, especially because the agents had no reason to suspect that the house contained two separate residences. As to the entrance into the alleged apartment, it is not unusual for a residence to have various entrances. Nor is it unusual for a residence to have separate driveways.

Thus, the agents conducted a reasonable investigation of the premises before obtaining the warrant. At the time that they applied for the warrant, the agents had no reason to believe that 1501 Ford Road consisted of two separate residences. Accordingly, as Harrison concedes, the warrant was validly issued.

### B. The execution of the warrant

Harrison does not dispute the validity of the warrant. Instead, he argues that the agents did not reasonably execute it. Harrison argues that the officers were validly authorized to search only 1501 Ford Road and that they should have realized during the search that 1501A was a separate residence. Harrison argues that the moment the officers realized that they had entered a separate apartment, they should have ceased their search.

As an initial matter, if the area that the officers seized the contraband from was truly not Harrison's residence, then he had no expectation of privacy in it. In *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 545 (6th Cir. 2003), the plaintiff owned a one-story house with a basement. He occupied the main floor and rented the basement to two individuals. After obtaining a warrant, officers searched the basement of the residence and discovered contraband. The plaintiff asserted a claim against the officers for violating his Fourth Amendment rights.

The Sixth Circuit noted that, in order to assert a Fourth Amendment violation, an individual "must show that the government's action in some way invaded his own reasonable expectation of privacy." *Id*. at 544. The court noted that, "[a]lthough [the plaintiff] owned the entire residence, ownership alone does not justify a reasonable expectation of privacy." *Id*. The court determined that the plaintiff "took no precautions to maintain any privacy interest in the basement when he leased the basement to [the lessees] and permitted them to occupy it as a separate residence." *Id*. at 545. Thus, the only individuals with an expectation of privacy in the basement were the lessees. *Id*.

Accordingly, if there was truly an apartment that was separate from the main residence and, thus, not included in the search warrant, Harrison had no reasonable expectation of privacy in it. It is true that Harrison was located in the area he identifies as his tenant's apartment at the time of the search. An overnight houseguest has a legitimate expectation of privacy in his host's home. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990). But Harrison submitted no evidence or even argued that he was an overnight guest, that he was invited by West to the area identified as the apartment, or that he was otherwise a "guest" in the apartment "there with the permission of his host . . ." *Id*. at 99. *See also*

*United States v. Berryhill*, 352 F.3d 315, 318 (6th Cir. 2003) ("Berryhill does not dispute that he never received permission to stay at the apartment directly from its tenant. Therefore, he could not be assured that his host would respect his privacy. Berryhill's expectation of privacy was not reasonable.") West testified that, when he stayed at the apartment, the door between the main residence and the apartment remained locked. (DE 218, Hr'g Tr. at 42.) He testified that, to his knowledge, Harrison did not ever come into the apartment. (DE 218, Hr'g Tr. at 49.)

But, even assuming that Harrison was an invited overnight guest in the apartment and, thus, does have standing to object to the search of it, the agents never had any reason to believe that the area constituted a separate residence from 1501 Ford Road. Thus, the agents acted reasonably when they searched the area. In *Garrison*, the Court determined that the validity of the search of Garrison's apartment pursuant to a warrant that authorized the search of the entire third floor "depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." 480 U.S. at 88. The Court determined that the search of the apartment was objectively reasonable because "[t]he objective facts available to the officers at the time suggested no distinction between [the target of the investigation's] apartment and the third-floor premises." *Id.* "Prior to the officers' discovery of the factual mistake, they perceived [the target's] apartment and the third-floor premises as one and the same." *Id.* Thus, their search of the entire third floor was reasonable.

Agent Hubbuch testified that, at the time that the agents entered the residence to execute the search warrant, Harrison was located in the alleged apartment. (DE 218, Hr'g Tr. at 65-66.) Again, it is undisputed that there was no door in the doorframe

leading from the main residence to the area identified as the apartment. Thus there was no physical separation between the residence and the apartment area.

Hubbuch testified that, once inside the alleged apartment area, the officers found not only Harrison himself but various items belonging to Harrison, all of which indicated that the area was part of Harrison's residence. In the bedroom located in the alleged apartment, the agents found a prescription pill bottle with Harrison's name on it in a nightstand next to the bed. (DE 218, Hr'g Tr. at 71.) The agents found a wallet that belonged to Harrison stuffed in a couch located in the middle of the alleged apartment area. (DE 218, Hr'g Tr. at 71.) The agents found prescription pill bottles with Harrison's name on them in a cabinet in the kitchen area of the portion of the residence identified as the apartment. (DE 218, Hr'g Tr. at 72.) There was a photograph of Harrison and his son in the alleged apartment. (DE 218, Hr'g Tr. at 69.) Further, the agents obtained several documents from the apartment area that contained Harrison's name on them. (DE 218, Hr'g Tr. at 73; Hr'g Gov. Ex. 25.)

In contrast, the agents obtained just one document addressed to Michael West at 1501 Ford Rd. #A. (DE 218, Hr'g Tr. at 73; Hr'g Gov. Ex. 25.) It is not clear at what point in the search the officers discovered this document. Nevertheless, because there was no separation between the main residence and the alleged apartment area and because the officers found multiple items indicating that the area was simply part of Harrison's residence, this single document found during the search should not have caused the officers to believe that some portion of the residence was leased to another party.

The objective facts available to the officers at the time of the search did not suggest any distinction between Harrison's main residence and the area where he was located at the time of the search. Thus, their search of the entire residence, including the area identified as the apartment, was reasonable.

### III. Conclusion

For all these reasons, that Court hereby ORDERS that Harrison's motion to suppress (DE 192) is DENIED.

Dated this 12th day of November, 2013.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY